IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| AAROW/IET LLC,<br>*United States of America for the Use and*<br>*Benefit of,*<br><br>Plaintiff,<br><br>v.<br><br>HARTFORD FIRE INSURANCE<br>COMPANY, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 1:19-cv-00085 (AJT/JFA) |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Aarow/IET, LLC ("Aarow/IET") has sued Defendants Harper Construction

Company, Inc. ("Harper") and Hartford Fire Insurance Company ("Hartford," together, the

"Defendants") under the Miller Act for work performed as a Harper subcontractor on a

government construction site. Harper and Hartford have filed motions for summary judgment

[Doc. Nos. 70, 73] (together, the "Motions"). Upon consideration of the Motions, the

memoranda filed in support thereof and in opposition thereto, the arguments presented at the

hearings held on May 12 and 27, 2021, and for the reasons that follow, the Motions are

GRANTED.

### I.  **BACKGROUND**

Unless otherwise indicated, the following facts are undisputed.

1.  Harper was awarded a contract to build two Basic School Student Officer

Quarters buildings at the Marine Corps Base in Quantico, Virginia (called Phases 5 and 6) with

options for two more buildings (Phases 7 and 8) ("the project"). [Doc. No. 71-1], Declaration of Andrew M. Anello ("Anello Decl.") ¶ 2.

2.　　On April 23, 2014, Aarow Electrical Solutions, LLC and Integrated Electrical Technologies Corp. entered into a Joint Venture Agreement to submit a bid for a subcontract to Harper for electrical work on the project under the name Aarow/IET, LLC ("Aarow/IET"). Aarow/IET is currently a limited liability company in good standing in the State of Maryland. [Doc. No. 84-1], Declaration of Jordan A. Stave ("Stave Decl.") at ¶ 2; Stave Decl., Ex. A. Aarow/IET is not registered to do business as a foreign limited liability company in Virginia. [Doc. No. 71-2], Declaration of David C. Grossman ("Grossman Decl.") ¶ 3.

3.　　Pursuant to the Miller Act, 40 U.S.C. § 3131 *et seq.*, Harper procured a Payment Bond from Hartford with respect to the project. [Doc. No. 29] ("Am. Compl."), Ex. A.

### A. The Subcontract

4.　　On May 2, 2014, Harper entered into a subcontract (the "Subcontract") with Aarow/IET to perform electrical work for the combined Phases 5 and 6 of the project at a fixed price of $5,345,000 with an option for Phase 7 at a fixed price of $2,745,175; Harper exercised that option after the Government exercised its option to add Phase 7 to Harper's contract. *See* Am. Compl., Ex. B; Anello Decl. ¶ 3. The Subcontract is governed by California law. *Id.* ¶ 27.

5.　　Paragraph 6 of the Subcontract required Harper to provide Aarow/IET with a "Construction Sequence Schedule" that would serve as a baseline schedule for Aarow/IET's work. Am. Compl., Ex. B ¶ 6(A). Harper provided this schedule to Aarow/IET in April 2014, before Aarow/IET began its work on the project. Anello Decl. ¶ 4. No provision of the Subcontract specifically provides that Aarow/IET would be guaranteed to achieve specific manpower efficiencies in prosecuting its work on the project, nor does the Subcontract contain

any provision guaranteeing that Aarow/IET would be able to perform its work in any particular sequence. The Subcontract does, however, contain the following provision that required Harper to "cooperate" with Aarow/IET to allow Aarow/IET to prosecute its work on the project properly:

> Cooperation between Parties: The Contractor shall cooperate with the Subcontractor for the prosecution of his work, and the Subcontractor shall cooperate with the Contractor and with other Subcontractors employed by the Contractor and with other Contractors employed by the Owner, in order to insure first class workmanship in every respect and the proper sequence of the work.

Am. Compl., Ex. B ¶ 5.

6.      Paragraph 6(A) of the Subcontract further states that upon Harper's providing the Construction Sequence Schedule, Aarow/IET:

> [A]grees to complete the work hereunder within the times as specifically set forth in said 'Construction Sequence Schedule' and to procure and prepare his materials and manufactured products so as to be ready to begin work in accordance therewith. [Subcontractor] agrees to perform said work in a prompt and diligent manner, commencing the several parts thereof at such times and proceeding therewith in such order as directed by the Contractor's superintendent, and agrees to finish the several parts and the whole of said work as provided herein so that, in conjunction with other trades engaged thereon, he will insure the uninterrupted progress of the project.

*Id.* ¶ 6(A).

7.      However, notwithstanding the Construction Sequence Schedule referenced in Paragraph 6(A), Paragraph rrr of Schedule B, attached to the Subcontract, states:

> Subcontractor understands the Contractor's Project Superintendent's weekly foreman's meeting 3-week look ahead schedule supersedes the original baseline schedule. It is the responsibility of the subcontractor's field foreman to obtain these schedules on a regular (weekly) basis and strictly adhere to the specified dates therein.

Am. Compl., Ex. B, Schedule B ¶ rrr.

8. Paragraph 7 of the Subcontract provides as follows with respect to delays and

extensions of time:

> **Extensions of Time of Completion:** If the Subcontractor shall be obstructed or
> delayed in the prosecution or completion of the work by the neglect or default of
> the Contractor, the Designer, the Owner, or of any other Subcontractor employed
> by or dealing with the Contractor, or other contractors employed by the Owner; or
> by the stopping of the work by employees of the Contractor, the Subcontractor, or
> any other Subcontractor of the Contractor through no fault of the Subcontractor,
> then the time, as fixed in Article 6 for the completion of the work, shall be extended
> for a period necessary to make up for lost time by reason of any or all the clauses
> (sic) aforesaid. No such extension, however, shall be made unless a claim therefor
> is served in writing on the Contractor within thirty (30) days of the occurrence of
> such delay.

Am. Compl., Ex. B ¶ 7 (alteration in original).

9. Paragraph 8 of the Subcontract provides the following with respect to Delays:

> **Delays:**
> A. In the event of any delays, entailed as a result of fault of Contractor or
>    Owner, then Contractor shall grant Subcontractor an extension of time equal
>    to the delay and Subcontractor shall be entitled to no other or further
>    damages against Contractor or Owner.
> B. Any delays or additional work entailed as a result of weather conditions,
>    storms, acts of God, delays in construction, and delays by governmental
>    bodies will not entitle the Subcontractor to any extras whatsoever.

Am. Compl., Ex. B ¶ 8 (alteration in original).

10. Paragraph 26 of the Subcontract, titled "Claims by Either Party Against the

Other" states:

> If either the Subcontractor or the Contractor believes he has a claim of any nature
> whatsoever against the other party, he shall give the other written notice of the
> amount, whenever possible, and nature of such claim within ninety (90) days (or
> such other time limit as may otherwise be expressly set forth in the Contract
> Documents) of the occurrence of the event upon which such claim is based. In
> default of such notice the claim is waived.

Am. Compl., Ex. B ¶ 26.

### B. Phases 5 and 6 of the Project

11.     Harper started construction on Phases 5 and 6 in May 2014 and substantially completed those phases in September 2016. Anello Decl. ¶¶ 5, 9.

12.     During the course of those phases, Harper periodically distributed full project schedules to its subcontractors.[1] Harper also distributed at weekly foreman's meetings attended by foremen representing each subcontractor, including Aarow/IET, the "3 week look-ahead" schedules referenced in Paragraph rrr of Schedule B, which provided more detail regarding the work to be performed by each subcontractor. *See* Am. Compl., Ex. B, Schedule B ¶ rrr. These 3 week look-ahead schedules were emailed by Harper's Superintendent, Shandy Coffman, and other Harper employees to all subcontractors and their leadership or ownership, including Scott Gagnon and Chet Gagnon of Aarow/IET. Anello Decl. ¶ 6; *id.*, Exs. 1, 2.

13.     At these meetings with subcontractors, Harper's site superintendent met with subcontractors to discuss upcoming work, any issues encountered on the project, and any necessary adjustments to the 3 week look-ahead schedule. Harper regularly adjusted the 3 week look-ahead schedule based on subcontractor feedback and distributed revised schedules at subsequent weekly foreman's meetings. Anello Decl. ¶ 6. Harper also gave Aarow/IET the full project schedule when Aarow/IET asked for it on April 14, 2015, but it is disputed whether it was the same project schedule Harper provided to the government on a monthly basis.[2] Anello Decl. ¶ 7; *id.*, Ex. 3.

---

[1] The parties disagree on how often the full project schedule was distributed. According to Aarow/IET, Harper did not distribute full project schedule updates to Aarow/IET on a monthly basis during the course of Aarow/IET's work on the project. [Doc. No. 84-12], Declaration of Christopher Scott Gagnon ("Gagnon Decl.") ¶ 5; *but see* [Doc. No. 71-3], Ex. 3 to Harper's Motion (an April 14, 2015 email from Andrew Anello of Harper to a distribution list that included Chet Gagnon and Cody Blair at Aarow/IET that said "[t]his is the project schedule that is updated monthly with the government. . . . I typically send these out each month after the approved percentage update is completed" and attached a "Quantico 3 Week Look Ahead Schedule 4.14.15.").

[2] Aarow/IET disputes that the project schedule Harper provided Aarow/IET was not the same project schedule Harper provided to the government on a monthly basis. Gagnon Decl. ¶ 6.

14.     Aarow/IET filed daily reports, which memorialized the work it had done on the project and identified the Aarow/IET personnel on site. Those daily reports contained a comments section, in which Aarow/IET would sometimes reference concerns or problems encountered on the job site. *See* Anello Decl. ¶ 8.

15.     Pursuant to the terms of the Subcontract, Aarow/IET submitted monthly payment applications to Harper for work performed on the project over the previous month, including any executed change orders. Anello Decl. ¶ 18.

16.     As part of each monthly payment application, Aarow/IET executed a "Conditional Waiver and Release Upon Progress Payment (Miller Act)" (the "Conditional Release").[3] Anello Decl. ¶ 18-19; *id.*, Ex. 9. After Aarow/IET submitted a signed Conditional Release, Harper issued a corresponding check to Aarow/IET for the amount reflected in the monthly payment application. *Id.* After obtaining payment by that check, Aarow/IET provided a signed "Unconditional Waiver and Release Upon Progress Payment (Miller Act)," (the "Unconditional Release") (together with the Conditional Release, the "Releases") which states:

> The undersigned has been paid and has received a progress payment in the sum of [the amount stated in the payment application] for labor, services, equipment or materials furnished to HARPER CONSTRUCTION COMPANY, INC. on [the project] and does hereby unconditionally waive and release any claim or right, including a payment bond or claim or right which the undersigned has on the above referenced job under the Miller Act (40 U.S.C. § 270a – 270e) to the following

---

[3] The Conditional Release states:

Upon receipt by the undersigned of a check from Harper Construction Company in the sum of [the amount stated in the payment application] payable to Aarow-IET, LLC and when the check has been paid by the bank upon which it is drawn, this document shall become effective to waive and release any claim or right, which the undersigned has on the job of U.S. Navy Contract Number N40080-13-C-0001 located at Quantico The Basic School SOQ PH 5, 6, 7, 8, Marine Corps Base, Quantico, VA [*i.e.*, the project] under the Miller Act (40 U.S.C. § 270a – 270e) to the following extent: This release covers a progress payment for labor, services, equipment or material furnished to Harper Construction Company through [a stated date] only and does not cover any labor, services, equipment or materials furnished after said date on the above described job or any retentions retained before or after the release date.

Anello Decl. ¶¶ 18-19; *id.*, Ex. 9.

extent: This release covers a progress payment for labor, services, equipment or other material furnished to HARPER CONSTRUCTION COMPANY, INC. through [a stated date] only and does not cover any labor, services, equipment or material furnished after said date on the above described job or any retentions before or after the release date.

Anello Decl. ¶¶ 18-19; *id.*, Ex. 9.

18.    In May 2016, Aarow/IET sought to add language to its Conditional and Unconditional Releases that preserved an "exceptions list" of pending change requests related to Aarow/IET's work on Phases 5 and 6. Anello Decl. ¶ 20; *id.*, Ex. 10. Aarow/IET's purpose in seeking to modify the Releases was to reserve its rights with respect to claims Aarow/IET might need to assert in order to recover compensation for damages it was incurring on the project. *See* [Doc. No. 84] (Pl.'s Opp'n to Harper's Mot.) at 23. Harper refused to accept any modifications to its Releases and requested that Aarow/IET resolve the outstanding change requests with Harper's Project Manager and then submit an unmodified release. *Id.* The parties dispute whether Aarow/IET's payments were conditioned on Aarow/IET accepting the unmodified Releases.[4] In any event, Aarow/IET provided signed unmodified Conditional and Unconditional Releases over the course of the project.[5]

19.    Following the substantial completion of Phases 5 and 6, Harper told Aarow/IET to provide a consolidated Change Notice that included all outstanding change requests for work performed during Phases 5 and 6 "for final negotiation," Anello Decl. ¶ 10; *id.*, Ex. 4.

---

[4] Aarow/IET contends Harper refused to allow Aarow/IET to modify its Releases and conditioned payments of amounts owed to Aarow/IET on Aarow/IET's execution of unmodified Releases. Stave Decl., Ex. B (Gagnon Depo., at 119:5–121:2; 131:6–132:11; 134:19–138:14; 141:18–143:16; 145:11–146:22). Harper states it informed Aarow/IET it would not accept a modified release, but "it will not hold up your payment," Anello Decl. ¶ 21; *id.*, Ex. 11, and never conditioned payments it otherwise owed Aarow/IET on Aarow/IET releasing claims, *id.* ¶ 22.
[5] Over the course of the project, Harper made 50 monthly progress payments to Aarow/IET; and Aarow/IET submitted and signed a Conditional Release with its payment application for each of these progress payments; and an Unconditional Release upon receiving payment. Anello Decl. ¶ 19.

20.     In response to Harper's request, Aarow/IET submitted on September 26, 2016 a consolidated Change Notice, in which it requested $51,703 to compensate Aarow/IET for additional materials and labor hours outside of the Subcontract, which included those items that it had previously attempted to reserve through an exceptions list to the Conditional and Unconditional Releases. Anello Decl. ¶¶ 10; *id.*, Ex. 4. Aarow/IET and Harper then engaged in negotiations over the final value of Aarow/IET's requests for changes, as well as Harper's claims for back charges to be assessed against Aarow/IET.

21.     On June 7, 2017, following months of negotiations regarding Aarow/IET's requests for changes, Aarow/IET submitted for Phases 5 and 6 a "proposal for all encompassing changes to date" in the amount of approximately $49,000 for all outstanding claims. Aarow/IET and Harper then engaged in verbal negotiations and agreed to a final change order value of $40,000.

22.     On June 15, 2017, Harper and Aarow/IET executed Subcontract Change Order 16, titled "Final CO Phase 5/6." Anello Decl. ¶¶ 9-12; *id.*, Exs. 4, 5, 6.[6] Change Order 16 states that:

> This final change order for P-566 & 567 [i.e., Phases 5 and 6] represents the final negotiated value to close all open/pending change orders. This scope of work represents all labor, material, equipment and supervision required to procure, fabricate, deliver and install all associated components and materials related to the identified scopes of work on the attached negotiated proposal and is considered total and complete to finish the project.
> All contract terms shall apply.
> ***
> Harper Subcontract terms and exhibits govern throughout this project. Any attached subcontractor proposal terms and conditions will not supersede.

---

[6] Aarow/IET later retracted Change Order 16 on the grounds that Cody Blair, who signed on behalf of Aarow/IET, did not have authority to execute the change orders. Stave Decl., Ex. C (Blair Depo., pp. 39:19—40:10). However, during this litigation, Aarow/IET conceded that regardless of Blair's lack of authority (which Harper disputes), Aarow/IET ratified Change Order 16; and any dispute as to Blair's authority is immaterial.

Anello Decl. ¶ 12; *id.*, Ex. 6. Aarow/IET accepted payment for all amounts included in Change Order 16 on August 4, 2017. Anello Decl. ¶ 14; *id.*, Ex. 7.

23.     On July 11, 2017, Aarow/IET signed a Conditional Release, which stated that "[u]pon receipt [by Aarow/IET]of a check from Harper Construction Company in the sum of $154,659.20 payable to Aarow-IET, LLC, and when the check has been paid by the bank upon which it is drawn, this document shall become effective to waive and release any claim or right, which the undersigned has on [the project]" to the same extent as in the Unconditional Release. Anello Decl., Ex. 7 at 1. On August 4, 2017, Harper paid to the order of Aarow/IET a check in the amount of $154,659.20.[7] Anello Decl., Ex. 7 at 2.

### C. Phase 7 of the Project

25.     Construction of Phase 7 started in October 2016 and reached substantial completion in June 2018. Anello Decl. ¶¶ 13, 15.

26.     On April 17, 2018, approximately sixteen months after the substantial completion of Phases 5 and 6, and ten months after entering into Change Order 16 as the "Final CO Phase 5/6," Aarow/IET submitted a Change Notice, requesting an equitable adjustment in the amount of $2,900,619 for what it characterized as "actual costs related to additional time, labor, general conditions, overhead, and bond costs for the completion of the electrical for phase 5, 6, and 7,"[8] based on a "Total Overall Project Extension of 298 working days." Am. Compl., Ex. C.

27.     On September 18, 2018, Aarow/IET and Harper executed Change Order 19, titled "Final Change Order."[9]  Change Order 19 was in the amount of $23,825.00 and stated:

---

[7] While the parties have not submitted the corresponding Unconditional Release, at oral argument Harper represented, and Aarow/IET does not contest, that the parties did sign an Unconditional Release following Harper's provision of the check to Aarow/IET. *See also* Anello Decl. ¶ 19.
[8] The requested amount also included a 10% "markup," i.e., profit in the amount of $261,081.79.
[9] Aarow/IET also later retracted this change order based on what it claimed was Cody Blair's lack of authority to bind Aarow/IET. However, as with Change Order 16, Aarow/IET has conceded that it ratified Change Order 19.

> This final change order for P-562 [*i.e.*, Phase 7] represents the final value to close all open/pending change orders.
>
> The scope of work represents all labor, material, equipment and supervision required to procure, fabricate, deliver and install all associated components and materials related to the identified scope of work on the attached proposal and is considered total and complete to finish the project.
>
> All contract terms apply. . . .
>
> Harper Subcontract terms and exhibits govern throughout this project. Any attached subcontractor proposal terms and conditions will not supersede.

Anello Decl. ¶ 16, Ex. 8. Aarow/IET was never paid the amount of Change Order 19. Gagnon

Decl. ¶ 7.

28.     September 25, 2018 was Aarow/IET's last day of work on the project. Anello

Decl. ¶ 17.

29.     On October 9, 2018, Aarow/IET executed a Conditional Release, signed by

Charles W. Gagnon, III, as "President" of "Aarow-IET, LLC," which stated:

> Upon receipt by the undersigned of a check from Harper Construction Company in the sum of $4,265.60, payable to Aarow-IET, LLC and when the check has been paid by the bank upon which it is drawn, this document shall become effective to waive and release any claim or right, which the undersigned has on [the project] to the following extent: This release covers a progress payment for labor, services, equipment or material furnished to Harper Construction Company through 09/30/18 only and does not cover any labor, services, equipment or material furnished after said date on the above described job or any retentions retained before or after the release date.

Anello Decl., Ex. 9 at 2.

30.     On November 6, 2018, following the payment of the check to "Aarow-IET, LLC"

in the amount of $4,265.60 on November 2, 2018, Aarow/IET executed an Unconditional

Release, also signed by Charles W. Gagnon, III, as "President" of "Aarow-IET, LLC," which

stated:

> The undersigned has been paid and has received a progress payment in the sum of $4,265.60 for labor, services, equipment or materials furnished to HARPER CONSTRUCTION COMPANY, INC. on [the project]and does hereby unconditionally waive and release any claim or right, including a payment bond or claim or right which the undersigned has on the above referenced job under the Miller Act (40 U.S.C. § 270a – 270e) to the following extent: This release covers a progress payment for labor, services, equipment or other material furnished to HARPER CONSTRUCTION COMPANY, INC. through 09/30/18 only and does not cover any labor, services, equipment or material furnished after said date on the above described job or any retentions before or after the release date.

Anello Decl., Ex. 9 at 1.

31.     Aarow/IET was paid a total $10,087,309.61 for the work it performed on the project. Of that amount, $9,253,844.91 was received by Aarow Electrical Solutions LLC ("AES") and $833,464.70 was received by IET. Gagnon Decl. ¶¶ 8, 10. As reflected on Aarow/IET records, Aarow/IET incurred total labor and material costs on the project of $9,612,852.23, all of which are listed as incurred by AES. Grossman Decl., ¶ 6; *id.*, Ex. 14.

32.     Based on the above allegations, Arrow/IET alleges that 'Harper did not cooperate with [Aarow/IET] in the scheduling and sequencing of [Aarow/IET's] work on the Project" and that "[d]ue to Harper's mismanagement of the Project, the Project suffered from numerous disruptions, all of which impacted [Aarow/IET's] ability to prosecute its work on the Project in a timely, efficient, and sequential manner which it originally anticipated and plan when it compiled its price to performance work on the project." Am. Compl. ¶¶ 19-20. Aarow/IET further alleges that as a result of this conduct, Harper breached the subcontract and as a result, it occurred damages in the amount of $2,900,619. *Id.* ¶ 51.

33.     All of Aarow/IET's claims in this action against Harper and Hartford are included in what Aarow/IET presented to Harper in its April 17, 2018 Change Notice. *See* Am. Compl., Ex. C; Grossman Decl., Ex. 15 (Aarow/IET Initial Disclosures) at 4.

34.     Since the filing of this action, Aarow/IET has revised downwards its original

claim in the amount of $2,900,619, submitted in April 2018, to "additional costs of $1,595,364

that Aarow/IET sustained because of impacts on the project which prevented Aarow/IET from

working in a continuous, logical, sequential, and efficient manner." *See* Grossman Decl., Ex. 16

(Expert Report on Schedule Impact and Related Added Costs on the Basic School Student

Officers Quarters at the Marine Corps Base in Quantico, Virginia prepared by Barry A. Brower,

Brower Construction Consulting, LLC, May 17, 2019 ("Brower Report")) at 7. According to the

Plaintiff's expert, over $1.2 million of its current $1.595 million claim relates to Phases 5 and 6.

## II.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only if the

record shows that "there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958–

59 (4th Cir. 1996).

The party seeking summary judgment has the initial burden to show the absence of a

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material

fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson*, 477 U.S. at 248. Once a motion for summary judgment is properly made and

supported, the opposing party has the burden of showing that a genuine dispute exists.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). To defeat a

properly supported motion for summary judgment, the non-moving party "must set forth specific

facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 247–48 ("[T]he mere

existence of *some* alleged factual dispute between the parties will not defeat an otherwise

12

properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."). Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Id.* at 255; *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).

Notwithstanding the general standard applicable to summary judgment motions, more discretion for courts to draw reasonable inferences on summary judgment in non-jury cases has been recognized. In that regard, "a district court has somewhat greater discretion to consider what weight it will accord the evidence." *S. Snow Mfg. Co. v. SnoWizard Holdings, Inc.*, 11 F. Supp. 3d 672, 681 (E.D. La. 2013) (citing *Johnson v. Diversicare Afton Oaks, LLC*, 597 F.3d 673, 676 (5th Cir. 2010) (citing *In re Placid Oil Co.*, 932 F.2d 394, 397 (5th Cir. 1991))). "When deciding a motion for summary judgment prior to a bench trial, the district court 'has the limited discretion to decide that the same evidence, presented to him or her as a trier of fact in a plenary trial, could not possibly lead to a different result.'" *Id.* (quoting *In re Placid Oil Co.*, 932 F.2d at 398). "Therefore, the Court may draw inferences from the evidence before it in deciding the motion for summary judgment." *Id.* ("The district court, as the trier of fact, was permitted to draw inference from this evidence to conclude that Johnson failed to present sufficient evidence of 'reporting' a violation of law."); *see also Cincinnati Ins. Co. v. Norfolk Truck Ctr., Inc.*, 430 F. Supp. 3d 116, 119 (E.D. Va. 2019) (citing *International Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359, 362 (4th Cir. 2003) ("It makes little sense to forbid the judge from drawing inferences from the evidence submitted on summary judgment when that same judge will act as the trier of fact, unless those inferences involve issues

of witness credibility or disputed material facts. If a trial on the merits will not enhance the court's ability to draw inferences and conclusions, then a district judge properly should draw his inferences without resort to the expense of trial." (quoting *In re Placid Oil Co.*, 932 F.2d at 398)).

## III.   ANALYSIS

Aarow/IET claims that Harper breached the cooperation clause of the Subcontract and as a result it is entitled to recover the amount of $1.5 million from Harper, which it characterizes as a "disruption" claim, as opposed to a delay claim, and in any event, regardless of Harper's liability, from Hartford under its payment bond. All of Aarow/IET's claim pertains to work performed on Phases 5, 6, and 7 of the project.

Harper contends that it is entitled to summary judgment in its favor on Aarow/IET's breach of contract claim on the grounds that (1) Harper did not breach the cooperation clause of the Subcontract as a matter of law; (2) Aarow/IET's claim is a not a "disruption" claim but a "delay" claim that is precluded by the "no damages for delay" provision of the Subcontract; (3) Aarow/IET failed to provide notice of its claim within ninety days, as required under the Subcontract; (4) Aarow/IET released its claims by way of the accord and satisfaction reached through Change Orders 16 and 19; (5) Aarow/IET also released its claims in the Unconditional Releases executed in connection with payments to Aarow/IET, including, in particular, its Unconditional Release for any work performed through September 30, 2018, executed on November 6, 2018, after Aarow/IET had completed its work and had left the job site on

September 25, 2018; and (6) Aarow/IET never registered to do business in Virginia and under Va. Code § 13.1-1057.A[10] it may not maintain this action.

Hartford contends that because its liability is contingent on Harper's liability, it is entitled to judgment in its favor to the same extent as Harper.

Aarow/IET contends that (1) there are genuine issues of material fact pertaining to whether Harper breached the cooperation clause that precludes summary judgment on its breach of contract claim; (2) its claim is a disruption claim, not a delay claim, that is not precluded under the Subcontract; (3) it timely provided the required notice of its claim through its daily reports, and in any event, it timely filed its claim within six years, as authorized in the Subcontract; (4) its claim is beyond the scope of Change Orders 16 and 19; (5) its claim is beyond the scope of the Unconditional Releases; (6) the Unconditional Releases are unenforceable since they were executed as a result of economic duress; and (7) the disability claimed under Va. Code § 13.1-1057.A has no application to its claim in this Court, which has federal subject matter jurisdiction pursuant to the Miller Act.

The Court concludes that there are genuine issues of fact pertaining to whether Harper breached the cooperation clause; whether its claim is a disruption claim or a delay claim; and whether the accord and satisfaction ostensibly reached in Change Order 19 is enforceable. The Court also concludes that Aarow/IET is not precluded from asserting a claim against Harper and Hartford because of its lack of business registration in Virginia. However, as discussed below (1) Aarow/IET did not have six years to file its claim; (2) as a matter of law, Aarow/IET failed to provide timely notice of its claim within the applicable ninety-day period through its daily

---

[10] Va. Code § 13.1-1057.A states that "[a] foreign limited liability company transacting business in the Commonwealth may not maintain any action, suit, or proceeding in any court of the Commonwealth until it has registered in the Commonwealth."

reports; (3) Aarow/IET released and waived its claims as a result of the accord and satisfaction

reached in Change Order 16; (4) in any event, Aarow/IET released and waived all of its claim

when it executed its Unconditional Release on November 6, 2018; (5) the Unconditional

Releases, and the November 6, 2018 Unconditional Release in particular, were not executed as a

result of economic duress; and (6) Hartford's liability is contingent on Harper's liability. Harper

and Hartford are therefore entitled to judgment in their favor as a matter of law.[11] *United States*

*v. Turner Constr. Co.*, 946 F.3d 201, 206 (4th Cir. 2019) ("If a court properly determines that the

contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a

matter of law and grant summary judgment because no interpretive facts are in genuine issue."

(quoting *World-Wide Rights Ltd. P'ship v. Combe Inc.*, 955 F.2d 242, 245 (4th Cir. 1992))).

### A. Aarow/IET is not precluded from asserting its claims against Harper because of its failure to register in Virginia.

Harper contends that Aarow/IET's disability under Va. Code § 13.1-1057.A prevents it

from maintaining this action against Harper because Aarow/IET has asserted subject matter

jurisdiction over its claims against Harper based on diversity jurisdiction and "[b]oth the Fourth

Circuit and the Supreme Court have held that 'a federal court should not open its doors to a

foreign corporation in which the courts of the state were closed because of its having done

business in the state without qualifying under the laws of the state[.']" [Doc. No. 86] ("Harper

Reply") at 8-9 (citing *Markham v. City of Newport News*, 292 F.2d 711, 718 (citing *Woods v.

Interstate Reality Co.,* 337 U.S.535, 538 (1949)). In its original complaint, filed on January 23,

2019, only against Hartford, Aarow/IET initially asserted subject matter jurisdiction based on the

---

[11] Given the Court's conclusions that Aarow/IET's claims are precluded under the Unconditional Release executed on November 6, 2018, its claim must be dismissed in its entirety, regardless of the merits of Harper's other defenses. Nevertheless, the Court for the purpose of a fulsome record on any appeal will address all of Harper's contentions.

Federal Miller Act, 40 U.S.C. § 3133, which gives the Court federal question jurisdiction over Hartford under 28 U.S.C. § 1331. On March 6, 2019, Harper filed a motion to intervene [Doc. No. 11], which was granted that same day [Doc. No. 13]. On April 9, 2019, Aarow/IET filed an Amended Complaint against both Hartford and Harper [Doc. No. 29], in which it alleged jurisdiction over its claims under the Miller Act and, "in addition," jurisdiction over its claims against Harper pursuant to diversity jurisdiction, *id.* at ¶¶ 4, 5.

The Court has subject matter jurisdiction over Aarow/IET's claims against Harper, not only under its diversity jurisdiction, but also under its supplemental jurisdiction under 28 U.S.C. § 1367, as all of its claims against Harper are related and arise out of the same facts as its claims against Hartford over which there is jurisdiction under the Miller Act. For this reason, whatever may be Aarow/IET's disability under Va. Code § 13.1-1057.A for the purposes of an action brought solely under diversity jurisdiction, the Court concludes that Va. Code13.1-1057.A has no application to claims brought under its supplemental jurisdiction relative to its federal question jurisdiction under the Miller Act.[12]

### B. Aarow/IET had ninety days not six years to give notice of any claims.

Paragraph 26 of the Subcontract, titled "Claims by Either Party Against the Other," provides:

> If either the Subcontractor or the Contractor believes he has a claim of any nature whatsoever against the other party, he shall give the other written notice of the amount, whenever possible, and nature of such claim within ninety (90) days (or such other time limit as may otherwise be *expressly set forth* in the Contract Documents) of the occurrence of the event upon which such claim is based. In default of such notice the claim is waived.

Am. Compl., Ex. B ¶ 26 (emphasis added).

---

[12] It is worth observing that even were Aarow/IET unable to pursue its claims against Harper, the Court would nevertheless still need to adjudicate the merits of those claims, given the derivative liability of Hartford and Harper's indemnity obligation to Harford, a reality ostensibly recognized by Harper when it intervened in this action; and through that intervention Harper has effectively acknowledged Aarow/IET's ability to assert its claims against it.

Aarow/IET argues it had not ninety days, but six years to file a claim with Harper. That contention is based on the reference in Subcontract Paragraph 26 to the "Contract Documents," which refers to the prime contract between Harper and the government, Contract No. N400-80-13-C-001 (the "Prime Contract"), Section 00700-Contract Clause, which refers to certain "CLAUSES INCORPORATED BY REFERENCE," and lists FAR "§ 52.233-1 Disputes JUL 2002." Stave Decl., Ex. F at 33. FAR § 52.233-1 provides, in pertinent part, that "[a] claim by the Contractor shall be made in writing and, unless otherwise stated in this contract, submitted within 6 years after accrual of the claim" and when the claim exceeds $100,000 shall include a certification that states:

> I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am authorized to certify the claim on behalf of the Contractor, and that these incorporations render the time for submitting notice of any claim against Harper to the six years provided under the FAR.

FAR § 52.233-1, available at: https://www.acquisition.gov/far/52.233-1 (last visited June 29, 2021).

The Subcontract is to be interpreted as a matter of law; and Aarow/IET's contention that it had six years to file a notice of claim against Harper fails for several reasons. First, a six year filing period for claims against the Prime by the Subcontractor is not "expressly set forth" in the Prime Contract. In fact, no six year period is "expressly set forth" in the Prime Contract. Rather, the relied upon six year period appears only in FAR § 52.233-1, which is simply referenced in the Prime Contract, along with a long list of other FAR provisions, without any recitation of its text. Second, FAR § 52.233-1, by its terms, applies to the filing of claims by the "Contractor" against the Government, *see* FAR § 52.233-1 ("the amount which the Contractor believes the

Government is liable"), and therefore applies to Harper's ability, as the prime contractor, to file a claim against the government. In short, FAR § 52.233-1 does not by its terms apply to the Subcontract. Third, in any event, FAR § 52.233-1 does not prescribe a time period for providing the pre-filing notice of a claim that the Subcontract requires, but rather is in the nature of an overall limitations period for the filing of claims, *see* FAR § 52.233-1 ("A claim . . . shall be made . . . within six years . . . ."). Finally, even if FAR § 52.233-1 did apply to the Subcontract, Aarow/IET failed to comply with its certification requirement.

Because the Subcontract explicitly requires that notice of any claim be given within ninety days and there is no other time period "expressly set forth in the Contract Documents" applicable to the filing of that notice, Plaintiff had ninety days from the date of an occurrence to give Harper notice of a claim, a conclusion ostensibly consistent with Aarow/IET's own understanding until recently.[13]

### C. Aarow/IET failed to give the required notice of its claim through its daily reports.

Aarow/IET first presented its claim asserted in this action as to Phases 5, 6 and 7 on April 16, 2018 in its Change Notice, sixteen months after the completion of Phases 5 and 6 and substantially into the completion of Phase 7. Accordingly, that filing was timely only as to claims based on occurrences within ninety days of that filing or for the period January 16

---

[13] The Court originally dismissed Plaintiff's claim based on its failure to give Harper a notice of claim within ninety days. *See* [Doc. No. 57] Tr. of Mot. Hrg. held on June 3, 2019, at 31: 21–24 ("The Court also concludes that the amended complaint fails to allege facts that takes its claim outside of the scope of Section 26. That section clearly and without qualification requires the written notice provided within 90 days of the event giving rise to the claim."). At no time prior to that dismissal did the Plaintiff claim that it had six years, rather than ninety days, for that notice, even though that time requirement was presented as the dispositive issue governing Plaintiff's claim. Similarly, during its appeal to the Fourth Circuit, the Plaintiff did not claim that it had six years, rather than ninety days, to file its notice of claim, even though, as presented to the Fourth Circuit, its ability to satisfy that ninety day requirement was central to its claim; and the Fourth Circuit reversed the Court's dismissal solely on the grounds that Aarow/IET had alleged facts that made it plausible that it had, in fact, provided notice of a disruption claim, as opposed to a delay claim, within the ninety days, as all parties apparently conceded the Subcontract required. *See* [Doc. No. 63].

through April 16, 2018.[14] In addition to its April 2018 filing, Aarow/IET claims that it satisfied the ninety day claims notice requirement through its filings of the daily reports.

Paragraph 26 of the Subcontract requires "written notice of the . . . nature of [the] claim" and "written notice of the amount, whenever possible." Am. Compl., Ex. B ¶ 26. Aarow/IET claims that its daily reports were sufficient to provide the requisite notice, pointing in particular to various statements in the Comments section of those reports. But as Aarow/IET concedes, there is nothing in those daily reports that states that it is giving notice of a claim, the nature of any claim, the possible amount of any claim, any recited occurrence or issue experienced on the jobsite that it considered to be the basis for a claim at some point or that it expected additional compensation at some point. In short, there is no evidence that those contractually required daily reports were intended to provide to Harper a notice of a claim, that Aarow/IET intended to give notice of a claim through those reports, or that Harper looked to those reports or expected to receive through those reports notice of a claim, or indeed, that Harper through those daily reports understood that Aarow/IET was asserting a claim.

Aarow/IET contends that under California law, Section 26's ninety day notice requirement constitutes a "forfeiture clause" that is to be construed narrowly and strictly against Harper and in any event, cannot be enforced to preclude a breach of contract claim. Pl.'s Opp'n to Harper's Mot. at 17 (citing *D. A. Parrish & Sons v. Cty. Sanitation Dist. No. 4 of Santa Clara Cty.*, 174 Cal. App. 2d 406, 413–14 (1959). Under California law, forfeiture clauses are typically strictly construed, *see, e.g.*, *Hawley v. Orange County Flood Control Dist.*, 211 Cal. App. 2d 708, 713 (1963) ("A clause which in ultimate result has the effect of imposing a forfeiture will be strictly construed . . . ."); but that principle applies only when there is no other

---

[14] Aarow/IET has not isolated what the amount of its claim falls within that time period; and it is unclear whether any portion of its claim relates to that period of time.

reasonable interpretation of the contract. *See, e.g.*, *Milovich v. City of Los Angeles*, 42 Cal. App. 2d 364, 373–74 (1941) (stating "forfeiture of any damages for noncompliance[] must be strictly construed against [the party] for whose benefit such clause was inserted in the contract . . . unless the right thereto is clear and certain"); *Hawley*, 211 Cal. App. at 713 ("A contract is not to be construed to provide a forfeiture, unless no other interpretation is reasonably possible." (quotation marks and citations omitted)). For example, in *Parrish & Sons*, the case on which Plaintiff centrally relies for its position that the Subcontract's ninety day notice provision does not apply to its breach of contract claim, the court reviewed a contract provision concerning "Extra, Additional, or Omitted Work," which required written notice of a claim within ten days from the date of its accrual and failure to do so as "a waiver and relinquishment of any such claim." 174 Cal. App. 2d at 413. The court interpreted that as a clause that only "refers to additional or extra work, not to damages incurred by appellant's frustration of respondent's ability to perform the prescribed work" and, as such, limited the forfeiture to claims concerning "additional" work, meaning work that enlarged the scope of the project or changed certain specifications that as a result increased the cost of the project, and excluded from the contractual forfeiture provision more general claims such as breach of contract. *Id.* The *Parrish & Sons* case, however, has been limited to its facts and does not "support[] the broad proposition that a forfeiture clause cannot apply to a breach of contract" claim. *Dep't of Transp. v. Heritage Eng'g Const., Inc.*, No. B161066, 2004 WL 2650700, at *13 (Cal. Ct. App. Nov. 22, 2004). Here, the Subcontract's ninety day notice requirement clearly and unambiguously applied to all claims of whatever nature; it allows for no other reasonable interpretation; and it must be enforced as written. *See id.* (upholding provision that required submission of all claims within thirty days as

enforceable and reasoning that "[c]ompliance with these required procedures" offered "the opportunity to resolve the entire dispute promptly and economically").

### D. Aarow/IET released and waived any claims through an accord and satisfaction as to Phases 5 and 6 in Change Order 16.

Harper contends that Change Order 16 constitutes an accord and satisfaction as to any work associated with Phases 5 and 6.

An accord and satisfaction may be accomplished between the parties where (1) there is a bona fide dispute between the parties; (2) the party asserting that defense made it clear that acceptance of what it tendered was subject to the condition that it was to be in full satisfaction of an unliquidated claim; and (3) the other party clearly understood when accepting what was tendered that it was intended to constitute payment in full of the particular claim in issue. *See Thompson v. Williams*, 211 Cal. App. 3d 566, 571 (1989).

Following the substantial completion of Phases 5 and 6 in September 2016, Aarow/IET told Harper it wanted additional compensation in connection with a number of issues that had arisen during Phases 5 and 6; and Harper had a number of back-charges for which it wanted compensation from Aarow/IET. Anello Decl. ¶ 9. Harper asked Aarow/IET to provide a consolidated Change Notice that included all outstanding change requests for work performed during Phases 5 and 6 "for final negotiation." Anello Decl. ¶ 10; *id.*, Ex. 4. As directed by Harper, Aarow/IET submitted, as requested, a consolidated June 7, 2017 Change Notice, in which it requested $51,703 compensation for additional materials and labors hours outside of the contract; and following months of negotiations, Aarow/IET submitted for Phases 5 and 6 a revised "proposal for all encompassing changes to date" in the amount of approximately $49,000 for all outstanding claims. Aarow/IET and Harper then engaged in further negotiations and agreed to a final change order value of $40,000. Anello Decl. ¶¶ 11-12; *id.*, Ex. 5. On June 16,

22

2017, Harper and Aarow/IET executed Subcontract Change Order 16, titled "Final CO Phase 5/6" for $39,814.00. Anello Decl. ¶ 12; *id.*, Ex. 6; Grossman Decl., Ex. 6. Change Order 16 stated in pertinent part:

> This final change order for [Phases 5 and 6] represents the final negotiated value to close all open/pending change orders. This scope of work [which represents all work required to perform the scopes of work in the attached negotiated proposal] is considered total and complete to finish [Phases 5 and 6 of] the project.

Anello Decl., Ex. 6.

Aarow/IET contends that its claim for additional costs as to Phases 5 and 6 survived Change Order 16 for two reasons: its proposed change order, submitted on June 7, 2017, which the parties subsequently negotiated, states that it "covers direct costs only and we reserve the right to claim for impact and consequential costs," Anello Decl., Ex. 6 at 4; and the Change Order itself stated that the scope of work addressed in the Change Order 16 relates only to "the identified scopes of work" that were listed in the June 7, 2017 proposed change order, *id.* at 1, 3, which does not include work for which Aarow/IET has asserted its claim in this action.

As reflected in their exchanges described above, the parties entered into Change Order 16 after months of negotiations in order to resolve all outstanding issues pertaining to the work performed on Phases 5 and 6 and its unqualified language reflects the parties' intent to reach a resolution on "all open/pending change orders," which included, as presented by Aarow/IET in its June 7, 2017 proposal and its subsequent "proposal for all encompassing changes to date," all of the outstanding work that Aarow/IET wanted addressed as to Phases 5 and 6; and while the agreement reached in Change Order 16 was based on specific items of work, the Change Order, by its terms, captured a scope of work that was "considered total and complete to finish the project." Anello Decl., Ex. 6. Aarow/IET's contention that it somehow reserved its "impact claim" or claims for additional work unrelated to what was listed in its June 7, 2017 change

23

notice is foreclosed, as a matter of law, by the language of finality in Change Order 16. *See* Cal.

Civ. Code § 1638 ("The language of a contract is to govern its interpretation, if the language is

clear and explicit, and does not involve an absurdity."); Cal. Civ. Code § 1639 ("When a contract

is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if

possible. . . ."). The payment agreed upon in Change Order 16 was made and under these

undisputed facts and circumstances, the parties entered into an accord and satisfaction as to

Phases 5 and 6 as a matter of law, which barred any subsequent claims as to Phases 5 and 6.[15]

### E. Aarow/IET released and waived all of its claims through its Unconditional Releases, particularly its Unconditional Release executed on November 6, 2018.

Change Order 16, which constituted a Final Change Order for Phases 5 and 6, was signed

by Aarow/IET on June 15, 2017; and on July 11, 2017, Aarow/IET signed a Conditional Release

that stated "[u]pon receipt of a check from Harper Construction Company in the sum of

$154,659.20 payable to Aarow-IET, LLC," it would "waive and release any claim or right,

which [it] has" on the project "for labor, services, equipment or material furnished to Harper

Construction Company through 06/30/17." Anello Decl., Ex. 7 at 1. On August 4, 2017, Harper

paid to the order of Aarow/IET a check in the amount of $154,659.20, and as a result waived all

claims for any work performed through June 30, 2017, which post-dates all work performed with

respect to Phases 5 and 6. *Id.* at 2.[16]

---

[15] To the extent the undisputed facts allow for more than one reasonable inference concerning the parties' intent with respect to Change Order 16, the Court, in its discretion afforded in this non-jury case, finds, based on the same evidence to be presented at trial, that the parties intended Change Order 16, and the payment made thereunder, to be an accord and satisfaction that precludes any subsequent claims as to Phases 5 and 6. *See Diversicare Afton Oaks, LLC,* 597 F.3d at 676 ("When deciding a motion for summary judgment prior to a bench trial, the district court has the limited discretion to decide that the same evidence, presented to him or her as a trier of fact in a plenary trial, could not possibly lead to a different result." (quotation marks and citations omitted)). Although the payment issue precludes summary judgment with respect to Change Order 19, the undisputed evidence establishes as a matter of law that the parties also intended to reach an accord and satisfaction as to Phase 7.

[16] The parties have not submitted the corresponding Unconditional Release, but at oral argument Harper represented, and Aarow/IET does not contest, that the Unconditional Releases were signed as a matter of course following the execution of the Conditional Release and the provision of the check to Aarow/IET, both of which happened here. *See also* Anello Decl. ¶ 19.

With respect to Phase 7, Aarow/IET's last day on the job was September 25, 2018, following the completion of its work on Phase 7.[17]  On April 17, 2018, Aarow/IET submited its $2.9 million Change Notice.  On September 18, 2018, it signed Change Order 19, which constituted a Final Change Order as to Phase 7 and, by its terms "represents the final value to close all open/pending change orders."  Anello Decl., Ex. 8.  On November 6, 2018, Aarow/IET signed an Unconditional Release, which stated:

> [Aarow/IET] has been paid and has received a progress payment in the sum of $4,265.60 for labor, services, equipment or materials furnished to HARPER CONSTRUCTION COMPANY, INC. [on the project] and does hereby unconditionally waive and release any claim or right, including a payment bond or claim or right which the undersigned has on the above referenced job under the Miller Act (40 U.S.C. § 270a – 270e) to the following extent: This release covers a progress payment for labor, services, equipment or other material furnished to HARPER CONSTRUCTION COMPANY, INC. through 09/30/18 only and does not cover any labor, services, equipment or material furnished after said date on the above described job or any retentions before or after the release date.

Anello Decl., Ex. 9 at 1.  As a result of this Unconditional Release, Aarow/IET waived and released as a matter of law all claims for work on the project through September 30, 2018, a release that precludes its entire claim.

Aarow/IET claims that these Unconditional Releases were limited in scope to the amount of the progress payment that it pertained to, for example, the $154,659.20 and $4,265.60 payments referenced above.  In other words, according to Aarow/IET, by signing these Unconditional Releases, Aarow/IET did nothing more than "unconditionally waive and release any claim or right" to the specific amount of the referenced progress payment in connection with work performed during the stated period, without any effect on its yet to be asserted claims, and only reduces those unasserted claims for work before the stated date by the amount of those

---

[17] Aarow/IET also later retracted Change Order 19 based on what it claimed was Cody Blair's lack of authority to bind Aarow/IET.  However, as with Change Order 16, Aarow/IET has conceded that it had ratified Change Order 19.

payments. In support of that position, Plaintiff relies on the legal principle under California law that the Releases are to be construed "most strongly" against the drafter, in this case, Harper. Pl.'s Opp'n to Harper's Mot. at 25 (citing *Sime v. Malouf*, 95 Cal. App. 2d 82, 109 (1949)).

The natural, straightforward and ordinary meaning of the Unconditional Release is that Aarow/IET is providing an unconditional general release in exchange for the referenced payment, but only for work performed through the designated date (*i.e.*, June 30, 2017 and September 30, 2018, in the two above referenced Releases), and not thereafter. That reading is supported by the reservation for work performed after those stated dates, without a similar reservation for any unpaid work before the stated date; and Aarow/IET's reading effectively makes the Release's language as to work after the specified date surplusage. The Court's interpretation is further supported by the definitions of "cover," meaning "deal with," Merriam-Webster Online, available at https://www.merriam-webster.com/dictionary/cover?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (last visited June 29, 2021), or "extend over," dictionary.com, available at https://www.dictionary.com/browse/cover (last visited June 29, 2021).[18]

Finally, Aarow/IET's contention with respect to the scope of the Unconditional Releases is fundamentally at odds with Aarow/IET's own conduct during the course of the project that demonstrates that it clearly understood the broad preclusive effects of the Releases that are the cornerstone of its now asserted economic duress defense. In that regard, Aarow/IET contends that during the project it sought "to modify the releases to reserve its rights with respect to claims Aarow/IET might need to assert in order to recover compensation for damages it was occurring

---

[18] Nor does California dictate any other result. *See* Cal. Civ. Code §§ 1638, 1639. In *Sime*, the court simply determined that a release that waived all claims "arising out of or connected with" a particular joint venture did not embrace a claim that did not arise out of that joint venture and was not connected with it. 95 Cal. App. 2d at 108–09.

on the project," Harper refused to modify the Releases, no one would have signed those Releases if it had any reasonable alternative, and Aarow/IET signed the Releases only to avoid the adverse economic consequences of not signing. *See* Pl.'s Opp'n to Harper's Mot. at 22–26. But Aarow/IET's requested modification would have been unnecessary if Aarow/IET understood the Releases to be as limited as it now claims. Indeed, at the hearing held on May 12, 2021, Aarow/IET stated in support of its economic duress defense that the Unconditional Releases waived all claims through the designated period, whether paid for or not, as a matter of law.[19]

### D. Aarow/IET did not sign the releases under economic duress.

There are also no material factual issues pertaining to Aarow/IET's economic duress claim as it pertains to the Unconditional Release executed on November 6, 2018; and, at the hearing on May 27, 20121 Aarow/IET disclaimed any economic duress defense with respect to that Unconditional Release executed on November 6, 2019. That defense can, therefore, be dismissed as a matter of law as to that Unconditional Release. Likewise, there are no material factual issues pertaining to Aarow/IET's economic duress claim as it pertains to any other Unconditional Releases, including in particular those signed after Change Order 16, and that claim as to all other Releases can be dismissed as well as a matter of law.

---

[19] Aarow/IET also took the position in connection with the scope of the Releases, outside of its economic duress defense, that by entertaining Aarow/IET's claims for additional compensation in Change Order 16, Harper's course of conduct reflected its own understanding that the Releases were limited in scope, as Aarow/IET contends. But that inconsistent position ignores (1) the evidence that notwithstanding the preclusive scope of the Releases, Harper entertained those additional claims as a matter of corporate policy that allowed Aarow/IET to present all outstanding claims in order to administratively reach a definitive, all-encompassing final resolution and close-out on the Subcontract as to Phases 5 and 6; and (2) Aarow/IET's concession during oral argument in connection with its economic duress defense that because of the Releases, Harper was under no legal obligation to entertain those claims. In any event, at the oral argument held on May 27, 2021, the parties stated that they would not present at trial any additional evidence of the parties' intent with respect to the scope of the Releases as reflected in any actual discussions, as opposed to the parties' subjective, unexpressed beliefs. For this reason, to the extent that the undisputed facts would allow for more than one reasonable interpretation of the Releases' scope, the Court would find, based on the same evidence that would be presented at trial, that the parties intended that the Unconditional Releases released and waived all claims for work through September 30, 2018.

Under California law, "[e]conomic duress can excuse an innocent party's contractual obligations when the other contracting party does 'a wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure.'" *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1119 (9th Cir. 2018) (quoting *Rich & Whillock, Inc. v. Ashton Dev., Inc.*, 157 Cal. App. 3d 1154, 1158 (1984)). In pleading economic duress, the pleading party "must have had no 'reasonable alternative' to the action it now seeks to avoid (generally, agreeing to contract)." *Green v. AILNH, LLC*, 2019 WL 1883910, at *2 (C.D. Cal. Feb. 14, 2019) (citing *Lanigan v. City of Los Angeles*, 199 Cal. App. 4th 1020, 1034 (2011)). Here, there is nothing improper about a contractor simply requiring a release as a condition of payment, something that in any event, was contemplated, and indeed, required, under the Subcontract. *See* Am. Compl., Ex. B ¶ 4. *See also, Brandwein v. Butler*, 161 Cal. Rptr. 3d 728, 754 n.21 (2013) (rejecting bad faith claim in insurance context where insurer demanded a release before making payment on the policy). Moreover, Aarow/IET has not presented any facts that would establish business consequences so severe as to give it no reasonable alternative but to sign the releases. *See Green*, 2019 WL 1883910, at *3 ("No reasonable alternative may exist when the only other alternative is bankruptcy or financial ruin."). In short, Aarow/IET has not presented facts that would allow a reasonable fact finder to conclude that any of the Unconditional Releases that it signed are unenforceable because of economic duress.

### E. Hartford is also entitled to summary judgment.

"In general, a surety assumes only the liability of its principal." *U.S. ex rel. Acoustical Concepts, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 635 F. Supp. 2d 434, 437 (E.D. Va. 2009). The Miller Act "creates a cause of action against the surety to the extent a subcontractor 'has not

28

been paid in full' and allows the subcontractor to recover only 'the amount unpaid.'" *Id.* (quoting 40 U.S.C. § 3133(b)(1)_.

Aarow/IET cites a number of cases in support of its position that that it may recover against Hartford, regardless of Harper's liability to it. *See, e.g., Consol. Elec. & Mechanicals, Inc. v. Biggs Gen. Contracting, Inc.*, 167 F.3d 432 (8th Cir. 1999) (stating subcontractor could recover from general contractor when project was delayed by various issues and general contractor's failure to act promptly caused subcontractor to incur delay damages); *Mai Steel Serv., Inc. v. Blake Const. Co.*, 981 F.2d 414, 419 (9th Cir. 1992) (holding general contractor's surety liable for all of subcontractor's damages that arose from construction delays where general contractor is liable even though even though delays were caused entirely by a third party and not the general contractor.). While those cases recognize the possibility of liability on the part of the general contractor's surety when the general contractor is only partially or entirely without fault because of the conduct of third parties, the liability of the surety is nevertheless predicated on the liability of the general contractor. *See Consolidated Elec. & Mechanicals, Inc.*, 167 F.3d at 435 (recognizing the governing principle that "[a] surety's liability under the Miller Act is measured by the general contractor's liability under the construction contract.") (citations omitted); *see also Artistic Stone Crafters, Inc. v. Safeco Insurance Company of America*, 726 F. Supp. 2d 595, 604 ("the surety company's liability is derivative of the contractor's liability to the plaintiff") (citations omitted); *Precision Air Conditioning of Brevard, Inc. v. The Cincinnati Insurance Company*, 2012 WL 1396281*4 E.D. Va. 2021) (same). Here, Aarow/IET's claim against Harper is based on Harper's breach of the Subcontract's cooperation clause, Am. Compl., ¶¶19, 20, 49, 51, and Hartford's liability under its payment bond is contingent on the success of that claim, *see* Am. Cas. Co. of Reading, Pa. v. Arrow Rd. Const. Co., 309 F.2d 923, 924 (9th

29

Cir. 1962) (affirming district court's conclusion that because subcontractor was not entitled to recover against the principal, it could likewise not recover against the surety co-defendant). For the reasons discussed above, Harper is not liable to Aarow/IET and, under the Miller Act, neither is Hartford. Hartford is therefore entitled to summary judgment.

### IV.    CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Harper Construction Company, Inc.'s Motion for Summary Judgment [Doc. No. 70] be, and the same hereby is, GRANTED; and it is further

ORDERED that Hartford Fire Insurance Company's Motion for Summary Judgment [Doc. No. 73] be, and the same hereby is, GRANTED; and it is further

ORDERED that this case be, and the same hereby is, DISMISSED.

The Clerk is directed to forward copies of this Order to all counsel of record and enter judgment pursuant to Fed. R. Civ. P. 58 in favor of Defendants.

/s/
_____
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
June 29, 2021